**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **PERFORMANCE PULSATION CONTROL, INC.** | § § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Civil Action No. _____** |
| **SIGMA DRILLING TECHNOLOGIES, LLC, INTREPID CONSULTING, LLC, JUSTIN MANLEY, ALLISON MANLEY, WILLIAM GARFIELD, and PAMELA GOEHRING-GARFIELD** | § § § § § § | **JURY** |
| **Defendants.** | § § | |

---

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

---

COMES NOW Plaintiff Performance Pulsation Control, Inc. ("Plaintiff" or "PPC"), and files this Original Complaint (the "Complaint") against Defendants Sigma Drilling Technologies, LLC ("Sigma"), Intrepid Consulting, LLC ("Intrepid"), Justin Manley ("J. Manley"), Allison Manley ("A. Manley"), William Garfield ("W. Garfield"), and Pamela Goehring-Garfield ("P. Garfield") (jointly, "Defendants") as follows:

### I.     BACKGROUND

1.     This is a civil action at law and in equity for declaratory judgment of ownership by PPC of certain trade secrets, patent rights, and copyrights, as well as a suit for damages against Defendants for misappropriation of PPC's trade secrets under Texas common law. PPC is a Texas-based corporation founded in August 1996 that specializes in the design and manufacture of maintenance-free and gas-charged pulsation control equipment. This lawsuit arises from the

misappropriation of certain trade secrets and proprietary and confidential information by a former employee, Defendant Justin Manley ("J. Manley"), while J. Manley was employed by PPC. Currently, J. Manley and the other Defendants are actively competing against PPC through their company Sigma and unlawfully selling pulsation dampening products based on proprietary technology that rightfully belongs to PPC, which was developed by Manley while he served as Sales and Marketing Manager for PPC.

2.      By this Complaint, PPC seeks a declaration from this Court that PPC is the owner of certain trade secrets, designs, drawings, patent applications and copyrights currently being misappropriated by Defendants to actively compete with PPC and that Defendants are infringing PPC rights associated with such technology. PPC further seeks damages against Defendants for their misappropriation of PPC's proprietary information and for unfair competition against PPC. Finally, PPC seeks attorneys' fees, costs, and exemplary damages against Defendants.

## II.      PARTIES

3.      Plaintiff Performance Pulsation Control, Inc. ("PPC") is a Texas corporation with its principal place of business in Collin County, Texas.

4.      Defendant Sigma Drilling Technologies, LLC ("Sigma") is a Texas corporation with its principal place of business in Collin County, Texas, and may be properly served with this Complaint by and through its registered agent, Justin Manley, located at 427 Rainforest Court, Murphy, Texas 75094.

5.      Defendant Intrepid Consulting, LLC ("Intrepid") is a Texas corporation with its principal place of business in Collin County, Texas, and may be properly served with this Complaint by and through its registered agent, Phil Horsch, located at 3616 Sandia Drive, Plano, Texas 75023.

6.     Defendant Justin Manley ("J. Manley") is an individual residing in Collin County, Texas and may be properly served with this Complaint at 427 Rainforest Court, Murphy, Texas 75094.

7.     Defendant Allison Manley ("A. Manley") is an individual residing in Collin County, Texas and may be properly served with this Complaint at 427 Rainforest Court, Murphy, Texas 75094.[1]

8.     Defendant William Garfield ("W. Garfield") is an individual residing in Clark County, Nevada and may be properly served with this Complaint at 6017 Rabbit Track St., Las Vegas, Nevada 89130.

9.     Defendant Pamela Goehring-Garfield ("P. Garfield") is an individual residing in Lehigh County, Pennsylvania and may be properly served with this Complaint at 6017 Rabbit Track St., Las Vegas, Nevada 89130.[2]

## III.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331, 1338 because this action arises under the Copyright Act.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because all or substantially all of the events giving rise to the claim occurred in Collin County, Defendant J. Manley resides in Collin County, and Defendant Sigma's principal places of business is located in Collin County.

---

[1] A. Manley is a former employee of PPC, as well as the spouse of J. Manley. A. Manley is a Defendant in this Action to the extent that she engaged in the alleged conduct as stated herein with J. Manley, as well as to the extent she maintains ownership to community property which is the subject of this Action.

[2] P. Garfield is the spouse of W. Garfield and is a Defendant in this Action to the extent that she maintains ownership to community property which is the subject of this Action.

## IV.   FACTS

**A.   PPC's Business**

12.     PPC is a Texas-based corporation founded in August 1996. From engineering, to design, to quality control, to manufacturing, PPC offers its clients over 125 combined years of expertise in the pulsation industry.

13.     PPC is an industry-leading designer, fabricator and manufacturer of pulsation dampening devices, and a provider of pump and pressure monitoring services, and related systems and technology for use in all industries in the marketplace, including the oil, gas and mining industries, and other fluid-related applications and industries. PPC provides services globally concerning maintenance-free (e.g., all liquid and cellular technologies) and gas-charged appendage and flow-through pulsation control products, high and low pressure applications, and pulsation dampening technology, systems and devices for all industries in the marketplace. PPC specializes in, among other things, sizing, engineering, designing, and refurbishing maintenance-free and gas charged pulsation control products, and field analysis concerning reciprocating pump pulsation problems (collectively, "PPC's Business").

14.     In August 2007, PPC became one of the few companies that manufactures both maintenance-free and gas charged units by its acquisition of Status Flow, Inc. ("Status Flow"). Today, Status Flow operates out of Odessa, Texas, as a division of PPC, and ensures that any application or project requirement can be met by its range of products.

15.     As part of PPC's Business, PPC develops, designs, engineers, and manufactures pulsation dampeners, and holds patents and patent applications for inventions in related technology. Pulsation dampeners are products installed at both the suction and discharge side of a reciprocating positive displacement pump. These dampeners increase hydraulic system performance and extend the pump's lifespan by controlling changes in pressure and flow.

Specifically, positive displacement pumps create pulsations or pressure gaps that could damage the pump system over time. Similar to shock absorbers on a vehicle, pulsation dampeners cushion the resulting hydraulic shocks and reduce pipe and pressure fluctuations. Overall, pulsation dampeners are meant to reduce damage to pipe system components, resulting in better pump efficiency, safety, and reliability. It also reduces the costs associated with maintenance of the pipe system.

**B.     PPC's Former Employee Justin Manley And His Scope Of Work At PPC, Which Included The Development And Marketing Of New Products To Increase PPC's Revenue Stream**

16.     J. Manley was employed by PPC from May 12, 2012 until April 7, 2016. Prior to working for PPC, J. Manley had no prior experience in the fields of oil and gas, liquid or gas pulsation control, pulsation analysis or field data collection.

17.     As early as the summer of 2012 – mere weeks after his employment began – J. Manley was assigned to be and identified as a member of the team that was involved in the development of certain pulsation technologies at PPC, including, but not limited to, the development and production of new pulsation dampeners and related technology. These development efforts included (i) maintenance-free vessels, (ii) vessels with gas-charged bladders and (iii) vessels with cellular material.

18.     For example, in order to create PPC's "PD-style dampener" in May of 2012, PPC's representatives met with outside vendors, including, but not limited to, Longwood and CTG, to create a gas-charged bladder for such a project. As part of his role at PPC, J. Manley met with these vendors during the course and scope of this employment to discuss the design and development of the bladder for the PD-style dampener, including the bladder for the PD-05.

19.     Furthermore, in connection with the "PD-style dampener," J. Manley was responsible for logistics associated with the sale and marketing of the dampener. J. Manley was

also specifically tasked with the "design" and "external shape" of PD-style dampener.

20.     On or around March 26, 2013, J. Manley was offered the position of "Sales & Marketing Manager" at PPC (the "Marketing Manager Position"). The purpose of Marketing Manager Position was to "grow the revenue stream" of PPC, requiring a "more proactive approach to [PPC's] sale and marketing efforts." The Marketing Manager Position included a base salary of $100,000 per year, fully paid health and dental insurance, a $1,000 per month car allowance, use of the company credit card, and an opportunity to participate in a bonus pool at the same percentage rate as other senior managers at PPC. PPC trusted Manley's use of the resources provided.

21.     In connection with the offer of the Marketing Manager Position, PPC explained that J. Manley would have the following scope of responsibilities and duties, among others:

     a.    J. Manley would "[d]evelop and suggest strategies for sales and marketing";

     b.    J. Manley would "[i]dentify various target markets, and create strategies for each";

     c.    J. Manley would "[a]ssist with new product development"; and

     d.    J. Manley would "[p]romote new product introductions."

22.     In addition, the offer letter specifically states that as Marketing Manager, J. Manley would "work with [PPC's] president and general manager to develop and implement appropriate marketing of PPC and its products using any number of possible techniques and methods."

23.     As part of the offer letter, J. Manley agreed that he would sign a variety of company agreements that included a nondisclosure/confidentiality agreement, a non-compete agreement, and an intellectual property agreement. Indeed, these agreements were effectively incorporated by reference into J. Manley's offer letter.

24.     J. Manley signed the offer letter and accepted the position as PPC's "Marketing Manager" on or around March 28, 2013.

25.     In subsequent internal emails, both PPC and J. Manley acknowledged his role in the development of new product ideas and research and development projects for PPC. For example, on or around November 11, 2014, J. Manley acknowledged that he and others were responsible for circulating a list of "new product ideas and R&D projects for PPC." As part of the normal course of business, J. Manley knew at that time that he was responsible for disclosing new product ideas to PPC.

26.     As further evidence of J. Manley's ongoing involvement in product developments, J. Manley was assigned in November of 2014 to be part of the research and development teams for Project 1958, the Wave Blocker – System Orifice (hereinafter referred to as the "Acoustic Assassin"), and Projects 1980 and 1982 - PD 05-15000 (the "PD Style Dampeners"). None of the plans and internal dimensions associated with these PPC development products are publicly available.

## C.     Justin Manley Agrees To Maintain Confidentiality Of PPC Technology, An Obligation Which Continued After His Termination

27.     While he was employed at PPC, J. Manley acknowledged his agreement to strictly maintain the confidentiality of PPC's information, including but not limited to design drawings and specifications, fixtures and fabrication techniques, computer programs and codes, customer lists, customer preferences, vendors lists, employees lists and information, financial information, marketing strategies, pending projects and proposals and research and development strategies. J. Manley also acknowledged his agreement to refrain from engaging in any work that would compete with PPC.

28.     Specifically, on June 15, 2012, J. Manley acknowledged his receipt and agreement to be bound by PPC's Employee Handbook.

29.     The terms of the Employee Handbook, in part, provide the following:

a.  **110 Outside Employment**

Employees may hold outside jobs as long as they meet the performance standards of their job with PPC. All employees will be judged by the same performance standards and will be subject to PPC's scheduling demands, regardless of any existing outside work requirements.

If PPC determines that an employee's outside work interferes with performance or the ability to meet the requirements of PPC as they are modified from time to time, the employee may be asked to terminate the outside employment if he or she wishes to remain with PPC.

Outside employment that constitutes a conflict of interest is prohibited. Employees may not receive any income or material gain from individuals outside PPC for materials produced or services rendered while performing their jobs.

b.  **112 Non-Disclosure**

The protection of confidential, proprietary and trade secret business information is vital to the interests and the success of PPC. Such confidential information includes, but is not limited to, the following examples:

- Design Drawings And Specifications
- Fixtures And Fabrication Techniques
- Computer Programs And Codes
- Customer Lists
- Customer Preferences
- Vendor Lists
- Employee Lists And Information
- Financial Information
- Marketing Strategies
- Pending Projects And Proposals
- Research And Development Strategies

As a condition of continued employment, you agree to strictly maintain the confidentiality of all such information. Depending upon your responsibility and access to confidential information within PPC, you may be required to sign an additional employee confidentiality agreement and non-circumvention agreement. Employees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment, even if they do not actually benefit from the disclosed information. In light of the irreparable harm and inadequate remedy at law that results from a violation of the terms of this provision, you agree that a court of competent jurisdiction may enter a Temporary Restraining Order against you, without the necessity of a bond, to maintain the *status quo*, pending a hearing on a Temporary Injunction.

c.  **517 Internet Usage**

* * * *

All Internet data that is composed, transmitted, or received via our computer communications systems is considered to be part of the official records of PPC

and, as such, is subject to disclosure to law enforcement or other third parties. Consequently, employees should always ensure that the business information contained in Internet email messages and  other transmissions is accurate, appropriate, ethical, and lawful.

The equipment, services, and technology provided to access the Internet remain at all times the property of PPC. As such, PPC reserves the right to monitor Internet traffic, and retrieve and read any data composed, sent, or received through our online connections and stored in our computer systems.

* * * *

The unauthorized use, installation, copying, or distribution of copyrighted, trademarked,  or patented material on the Internet is expressly prohibited, even if for personal use. As a general rule, if an employee did not create material, does not own the rights to it, or has not gotten authorization for its use, it should not be put on the Internet. Employees are also responsible for ensuring that the person sending any material over the Internet has the appropriate distribution rights.

Abuse of the Internet access provided by PPC in violation of law or PPC policies will result in disciplinary action, up to and including termination of employment. Employees may also be held personally liable for any violations of this policy. The following behaviors are examples of previously stated or additional actions and activities that are prohibited and can result  in disciplinary action: [in relevant part]

- Using the organization's time and resources for personal gain
- Violating copyright law
- Failing to observe licensing agreements
- Jeopardizing the security of the organization's electronic communications systems
- Engaging in any other illegal activities

30.     J. Manley was terminated on April 7, 2016. By letter dated April 19, 2016, PPC notified J. Manley of his continuing obligations to maintain PPC's confidential, propriety, and trade secret business information.

**D.      J. Manley's Secret Formation Of A Competing Company (Sigma) and Products (CFC Kit) During His Employment With PPC.**

31.     Unbeknownst to PPC at the time, in April of 2014 – two years after he was hired by PPC and two years prior to his termination – J. Manley had formed a competing company to PPC. The competing company was called Sigma. In addition, during this period, J. Manley also claimed to invent and filed patent applications personally, for two products which were (i) within

the course and scope of his employment with PPC, (ii) were developed by J. Manley using PPC's resources, and (iii) represented competitive products and business to PPC.

32.     According to the records of the Texas Secretary of State, Sigma was formed on April 15, 2014, as a Texas limited liability company, with J. Manley as its managing member and registered agent. The Texas Franchise Tax Public Information Report filed for 2015 identifies the principal office for Sigma as J. Manley's and his wife's (A. Manley) home address and lists J. Manley as "President." Sigma's online profile advertises that it operates in the industrial pumps and parts business / industry, has been operating for approximately two (2) years and generates $150,000 in annual revenues. It also lists J. Manley as "Managing Member."

33.     Sigma reserved the domain name "www.sigmadrillingtech.com" in April of 2014. The website lists a copyright date of 2014. Sigma's website was created currently features the following products:

      a.     The Charge Free Dampening System;

      b.     The Charge Free Dampener;

      c.     The Charge Free Conversion Kit; and

      d.     The Acoustic Assassin.

34.     Sigma joined Twitter in January of 2015, describing itself as providing "revolutionary and innovative systems that allow for higher efficiency while achieving superior performance." In internet advertisements, Sigma further describes itself as "a cutting edge company offering custom engineered pulsation dampeners and pulsation control systems for the Oil and Gas industry." It was later discovered that J. Manley was "tweeting" on behalf of Sigma during PPC's work hours.

35.     In its online marketing materials, Sigma provides the following statement about its business:

Sigma Drilling Technologies is one of the leading companies exceling in highly effective pulsation solutions for your industrial pumps used in drilling applications. From highly engineered products to innovative development and improvement of existing systems, the company stands on the forefront in offering highly advanced technologies and solutions for drilling applications. Their main aim is to help companies accomplish their goals by getting the most out of their drilling tools and the investment made thereof. Sigma Drilling Technologies, by utilizing their cutting edge, patent pending system, takes your existing gas charge dampeners and converts them into a high performance maintenance free solution. They believe in collaborating with the clients to help maximize their operational output, enhance the pump's performance and longevity while reducing "wear & tear" and expenses.

Sigma Drilling Technologies provide high-quality pulsation control solutions. These technologies are installed downstream of reciprocating, positive displacement pumps (mud pumps) that generate pulsating flows leading to pressure variations. The proprietary designs from Sigma increase performance, reduce rig down time, and consistently out perform traditional pulsation control systems. By utilizing existing rig equipment, Sigma has created an inexpensive solution that can be installed on 95% of drilling rigs commissioned in the world today.

The company manufactures a proprietary line of Charge Free Conversion Kits, or CFC Kits that convert old gas charge pulsation dampeners into high performance, maintenance free pulsation solutions. The Charge Free Conversion Kit can be easily installed in the field and has proven to reduce not only pressure variations, but will significantly quiet the noise in the line. MWD signal detection is drastically increased providing sync-up on first or second attempt. This increase in signal detection has given some rigs over an hour a day of additional drilling time. In today's industry climate, the need for drilling efficiency is at an all-time high, and the Charge Free Conversion Kit is serving these needs with multiple improvements while utilizing existing capital equipment.

Moreover, Sigma Drilling Technologies, being a widely recognized innovator, is well equipped with new and advanced drilling equipment technologies that can be used for various efficiencies with reciprocating pumps. Their skilled team of imaginative thinkers are extremely dedicated in providing durable and robust equipment to support your drilling requirements and objectives. Also, they have highly professional and experienced system engineers that can help trouble shoot system irregularities and failures. On location data collection with laboratory analysis can help in examining every segment of your project. Sigma will be ready with effective solutions for your industrial or drilling project needs.

36.    During the time J. Manley was being compensated as PPC's Marketing manager,

J. Manley filed two provisional patent applications as "inventor":

     a.   September 16, 2013 – Provisional utility application entitled "Dampening

       Apparatus," An automated nitrogen charging and adjustment system for

gas-charged pulsation equipment, U.S. Patent Application No. 61/878,174, Inventor Justin P. Manley; and

b. August 14, 2014 – Provisional utility application entitled, "Maintenance-Free Cellular Conversion Kit for Gas-Charged Discharge Pulsation Dampeners, U.S. Provisional Patent Application No. 62/037,901, Inventor Justin P. Manley.

37.     The automated nitrogen charging and adjustment system for gas-charged pulsation equipment was specifically discussed within PPC and disclosed to J. Manley as a potential PPC product during J. Manley's course and scope of employment. J. Manley did not disclose to PPC or request PPC's approval to file these patent applications. The development of both of these inventions were within J. Manley's course and scope of employment by PPC, are competitive to PPC's product line, and would provide PPC with a competitive advantage.

**E.     PPC Discovers Manley's (and Another Former Employee's) Competing Company Sigma.**

38.     According to the records of the Texas Secretary of State, Defendant Intrepid was formed on March 30, 2010, as a Texas limited liability company, with J. Manley as its owner and director. The Texas Franchise Tax Public Information Report filed for 2016 identifies the principal office for Intrepid as J. Manley's and A. Manley's home address and J. Manley as President.

39.     Defendant W. Garfield is a former employee of PPC. W. Garfield worked for PPC as "Project Engineer" in PPC's engineering department from February 13, 2013 until July 19, 2013. Prior to working for PPC, W. Garfield had no experience in the fields of oil and gas, liquid or gas pulsation control, pulsation analysis or field data collection. Similar to J. Manley, while he was employed at PPC, W. Garfield acknowledged his agreement to strictly maintain the confidentiality of PPC's information, including but not limited to design drawings and

specifications, fixtures and fabrication techniques, computer programs and codes, customer lists, customer preferences, vendors lists, employees lists and information, financial information, marketing strategies, pending projects and proposals and research and development strategies. W. Garfield also acknowledged his agreement to refrain from engaging in any work that would compete with PPC. Specifically, on February 20, 2013, W. Garfield acknowledged his receipt and agreement to be bound by PPC's Employee Handbook.

40.     On or about June 20, 2016, PPC became aware that both J. Manley, individually and as Managing Member of Sigma and/or as owner and director of Intrepid, along with Defendant W. Garfield, were utilizing confidential and proprietary information of PPC. Specifically, PPC became aware that J. Manley and W. Garfield were utilizing its confidential and proprietary information in marketing and selling pulsation control products and services to the oil and gas industry and to PPC's existing customers and soliciting PPC's vendors—while still employed by PPC.

41.     J. Manley and W. Garfield became aware of those customers and vendors strictly and solely while employees of PPC. At all times, PPC took action to maintain the confidentiality of its proprietary and trade secret information, including the identity of its customers and vendors.

42.     Upon information and belief, J. Manley and W. Garfield have been using PPC's confidential information and circumventing its products and technology. Even worse, at least J. Manley was engaged in such improper conduct while employed at PPC. Indeed, immediately following J. Manley's termination, J. Manley and W. Garfield took further action to engage PPC's customers and vendors.

43.     For example, on September 7, 2015, both J. Manley and W. Garfield jointly filed a utility applications with the United States Patent Office (Application no. 14/846,872), seeking to

patent a pulsation dampener, which, based upon and belief, is the "Maintenance-Free Cellular Conversion Kit for Gas-Charged Discharge Pulsation Dampeners," or "CFC Kit" described on Sigma's website that was developed based on technology that was provided to J. Manley within the course and scope of his employment.

44.     Furthermore, J. Manley has admitted that they have developed, manufactured, and distributed for sale oil and gas equipment products known as "CFC Kits," as well as the Acoustic Assassin. Although J. Manley alleges he was the "inventor" of the technology used in the CFC Kits and the Acoustic Assassin, upon information and belief, the skills, knowledge, and resources that J. Manley and W. Garfield would have required to develop such technology came exclusively from their employment with PPC and as a result of J. Manley's and W. Garfield's exposure to PPC's trade secret, confidential, and proprietary information.

45.     Upon information and belief, as of the date of this lawsuit, J. Manley, W. Garfield, Sigma, and Intrepid continue to develop, manufacture, and distribute for sale CFC Kits and the Acoustic Assassin, as well as other products derived from these products, and have obtained profits based on engaging in such business. Therefore, PPC has no choice but to file the current lawsuit.

## V.     CAUSES OF ACTION

**Count 1:     Declaratory Relief as to Ownership of Trade Secrets**

46.     PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

47.     Under Texas law, courts evaluate six factors to determine whether a trade secret protected by law exists: (1) the extent to which the information is known outside of relevant business; (2) the extent to which it is known by employees and others involved in business; (3) the extent of the measures taken to guard the secrecy of the information, (4) the value of the information to competitors; (5) the amount of effort or money expended in developing the

information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

48.     In a prior lawsuit and original petition, J. Manley and Sigma alleged that the CFC Kits and the Acoustic Assassin were trade secrets belonging to them, even though such products were developed while J. Manley was paid as an employee of PPC within the scope of their employment at PPC to develop new products.

49.     There is an actual controversy within the meaning of 28 U.S.C. §§ 2201 and 2202, in that both Plaintiff and Defendants claim ownership of the trade secrets relating to the CFC Kits and Acoustic Assassin.

50.     Accordingly, PPC seeks a declaratory judgment that the CFC Kits, the Acoustic Assassin, any such other products derived from these products, and any other intellectual property at issue herein are trade secrets that are solely owned by Plaintiff.

**Count 2:          Declaratory Relief as to Ownership of Patent Rights**

51.     PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

52.     PPC owns all rights, title, and interest to the following patent applications:

a.   September 16, 2013 – Provisional utility application entitled "Dampening Apparatus" An automated nitrogen charging and adjustment system for gas-charged pulsation equipment, U.S. Patent Application No. 61/878,174, Inventor Justin P. Manley;

b.   August 14, 2014 – Provisional utility application entitled, "Maintenance-Free Cellular Conversion Kit for Gas-Charged Discharge Pulsation Dampeners, U.S. Provisional Patent Application No. 62/037,901, Inventor

Justin P. Manley; and

    **c.**   September August 7, 2017 – Utility application entitled, "Maintenance-Free Cellular Conversion Kit for Gas-Charged Discharge Pulsation Dampeners, U.S. Patent Application No. 14/846,872, Co-Inventors J. Manley and W. Garfield and published by the United States Patent Office on March 9, 2017 (collectively, the "Patent Applications").

53.    Specifically, these Patent Applications are based on proprietary information and trade secrets belong to PPC because they were developed by PPC and/or by Justin Manley within the course and scope of his employment at PPC, and it was his responsibility at PPC to develop new products.

54.    By an through a lawsuit that was filed against PPC, at least Defendants J. Manley and Sigma have both claimed ownership in all rights, title, and interest to these patent applications.

55.    There is an actual controversy within the meaning of 28 U.S.C. §§ 2201 and 2202, in that both Plaintiff and Defendants claim ownership of the technology disclosed and taught in the patent applications.

56.    Plaintiff therefore seeks a declaratory judgment that PPC owns all right, title, and interest to the Patent Applications.

**Count 3:**    **Declaratory Relief as to Copyright Ownership Rights (Derivative Works) Under Copyright Act (17 U.S.C. § 101, et seq.)**

57.    PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

58.    An actual controversy has arisen and now exists between PPC and Defendants pursuant to the federal copyright laws concerning Defendants' continued insistence upon their purported sole ownership of the CFC Kit, the Acoustic Assassin, and such other products derived

from these products, namely the rightful ownership of all drawings, designs, patent applications, and other works and intellectual property relating to the CFC Kit, the Acoustic Assassin, and any such other derivative products.

59.     PPC created and owned intellectual property embodying the substance of the CFC Kit, the Acoustic Assassin, and any other product derived from those products prior to Defendants' association with PPC, and that the CFC Kit, the Acoustic Assassin, and any such other products derived from these products are, therefore, a derivative work based upon such prior materials, which is subject to PPC's exclusive ownership and control under federal copyright law. *See, e.g.*, *Stewart v. Abend*, 495 U.S. 207, 223 (1990) ("The aspects of a derivative work added by the derivative author are that author's property, but the element drawn from the pre-existing work remains on grant from the owner of the pre-existing work."); *see also* 17 U.S.C. § 103 (b) ( "The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material."). Federal copyright law requires that derivative work protection inures where the derivative work reflects non-trivial, original features added to a pre-existing copyrighted work that was lawfully used or accessed by license or permission of the latter's copyright owner. *See Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 345-346 (1991) (holding that "[t]o qualify for copyright protection, a work must be original to the author, . . . [meaning] that "the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity".).

60.     PPC therefore requests a declaratory judgment from this Court that PPC is the sole owner under copyright of all products developed by J. Manley and Sigma, including but not limited

to the Patent Applications, CFC Kit, the Acoustic Assassin, and such other products derived from these products, and as a result, that any and all other materials incorporating all or portions thereof, are similarly and necessarily owned by PPC, as being derivatives of PPC's pre-existing protected materials that were shared with Defendant J. Manley, Defendant A. Manley, and/or Defendant Garfield precipitating Defendants' alleged development of the CFC Kit, the Acoustic Assassin, and any other products derived from those products.

61.     Alternatively, PPC desires a declaratory judgment that Defendants' contributions to the Patent Applications, CFC Kit, the Acoustic Assassin, and such other products derived from these products are trivial and/or are non-original refinements of PPC's original copyrightable works, and therefore any copyright ownership therein belongs solely to PPC.

**Count 4:     Declaratory Relief as to Copyright Ownership Rights (Work Made For Hire) Under Copyright Act (17 U.S.C. § 101, et seq.)**

62.     PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

63.     As a general rule, the author of a copyrightable work is "the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S. Ct. 2166, 2171, 104 L. Ed. 2d 811 (1989). The work made for hire doctrine, however, carves out an important exception. 17 U.S.C. § 201(b). Under this doctrine, the general rule conferring copyright ownership to its author is qualified to provide that "the employer or other person for whom the work was prepared is considered the author ... and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." *Id.* Under section 101 of the Act, a work made for hire can arise under two circumstances: (a) a work prepared by an employee within the scope of his or her employment; or (b) a work specially ordered or commissioned ... if the parties

expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. *Id.* at § 101.

64.     PPC alleges that Defendants J. Manley, A. Manley, and W. Garfield were at all times properly classified as employees under applicable state and federal laws.

65.     PPC alleges that Defendants J. Manley, A. Manley, and/or W. Garfield, to the extent they developed the Patent Applications, CFC Kits, the Acoustic Assassin, and/or any such other products derived from these products at all, or any intellectual property relating thereto, such development occurred while they were employees within the scope of their employment with PPC.

66.     Accordingly, based on the foregoing, PPC desires a declaratory judgment pursuant to 28 U.S.C. § 2201 that PPC owns all relevant intellectual property, as well as real property created as a result of the intellectual property, that was developed by Defendant J. Manley, Defendant A. Manley, and/or Defendant Garfield while they were employees, including but not limited to the Patent Applications, CFC Kits, the Acoustic Assassin, and such other products derived from these products.

**Count 5:     Trade Secret Misappropriation against J. Manley, A. Manley, W. Garfield, Sigma, and Intrepid**

67.     PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

68.     PPC's information, including but not limited to its design drawings and specifications, fixtures and fabrication techniques, computer programs and codes, customer lists, customer preferences, vendors lists, vendor technology, rubber formulations, employees lists and information, financial information, marketing strategies, pending projects and proposals, and research and development strategies (collectively, the "Confidential Information"), constitutes a trade secret protected by Chapter 134A of the Texas Civil Practice and Remedies Code (the "Texas

Uniform Trade Secret Act" or "TUTSA") because (a) it derives economic value, actual or potential, from not being generally known to, or ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) PPC has taken reasonable efforts to maintain its secrecy.

69.     J. Manley, A. Manley, W. Garfield, Sigma, and Intrepid have misappropriated or are misappropriating PPC's trade secrets in violation of TUTSA. Among other things, Defendants acquired PPC's trade secrets by improper means, namely by, among other things, J. Manley's, A. Manley's, and W. Garfield's theft of the trade secrets in violation of the PPC Employee Handbook. In addition, Sigma and Intrepid have used or are using PPC's Confidential Information without PPC's express or implied consent even though Sigma and Intrepid knew or had reason to know that the disclosure of PPC's trade secrets was improper and that J. Manley, A. Manley, and/or W. Garfield acquired such information under circumstances giving rise to a duty to maintain its secrecy or limit its use.

70.     Defendants' conduct amounts to theft of trade secrets which has caused or, if allowed to continue, will likely cause damage to PPC.

71.     PPC seeks damages for the actual losses it has suffered, unjust enrichment to Defendants, and/or a reasonable royalty for Defendants' unauthorized use of PPC's trade secrets. In addition, PPC seeks exemplary damages for Defendants' willful and malicious misappropriation. Furthermore, PPC seeks an award of attorneys' fees for Defendants' willful misappropriation under the Texas Uniform Trade Secrets Act.

**Count 6:        Civil Theft against J. Manley, A. Manley, Garfield, Sigma, and Intrepid**

72.     PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

73.     While employees of PPC, Defendants J. Manley, A. Manley, and W. Garfield used PPC's time, funds, car allowance, credit cards, computers, expense report process ("PPC's Resources"), as well as PPC's trade secrets, confidential, and proprietary information for their own personal gain, and J. Manley and/or A. Manley also used PPC's Resources for the gain of Sigma and Intrepid.

74.     By their misappropriation of PPC's Resources and Confidential Information, Defendants have unlawfully appropriated or are unlawfully appropriating PPC's property in violation of Chapter 134 of the Texas Civil Practice and Remedies Code (the "Texas Theft Liability Act") and have caused PPC to suffer damages.

75.     Upon information and belief, Defendants have developed and continue to develop Patent Applications, CFC Kits, the Acoustic Assassin, and derivative products by unlawfully appropriating PPC's Confidential Information, proprietary information, and trade secrets, and have obtained substantial profits in so doing. Moreover, Sigma has advertised on their website that their products are replacements for maintenance pulsation dampening devices, and thus, it follows that Defendants' products are clearly in competition with PPC's products.

76.     Upon information and belief, Sigma is now selling complete pulsation dampening devices in direct competition with PPC.

77.     Accordingly, Plaintiff asserts that Defendants committed theft of PPC's Resources and Confidential Information, and seek their return pursuant to the Texas Theft Liability Act. Plaintiff also seek statutory penalties pursuant to the Act and exemplary damages as a result of Defendants' intentional and willful conduct.

**Count 7:     Conversion against J. Manley, W. Garfield, Sigma, and Intrepid**

78.     PPC re-alleges and incorporates by reference the foregoing factual allegations as if

fully set forth herein.

79.     PPC rightfully owns, and has the right to immediate possession of PPC's Confidential Information that Defendants misappropriated, as well as any of PPC's intangible Confidential Information which J. Manley and/or W. Garfield reduced to some tangible form. Defendants, without PPC's authorization, have wrongfully disclosed, used, and derived information and property from PPC's Confidential Information. Defendants have no right of possession to the Confidential Information following J. Manley's and W. Garfield's employment separation. Defendants' conduct deprived PPC of its rightful and exclusive ownership. Defendants' conversion has caused PPC damages.

**Count 8:      Unfair Competition against J. Manley, W. Garfield, Sigma, and Intrepid**

80.     PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

81.     Defendants' conduct as stated above amounts to unfair competition prohibited by Texas law which has caused damage to PPC. PPC's Confidential Information is the product of PPC's extensive time, labor, skill and money. Defendants' have obtained or are attempting to improperly obtain PPC's valuable secret and proprietary information to provide Defendants an unlawful advantage in competition with PPC. PPC has suffered damages as a result of Defendants' unfair competition.

**Count 9:      Breach of Contract against J. Manley and W. Garfield**

82.     PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

83.     Defendants J. Manley and W. Garfield owed contractual obligations to PPC by virtue of their acknowledgement of—and agreement to comply with—the provisions set forth in

PPC's Employee Handbook. Defendants J. Manley and W. Garfield breached their contract with PPC by using and disclosing PPC's trade secrets, confidential, and propriety information; engaging in business activities which competed with PPC; and failing to return or destroy PPC's confidential and proprietary information from his personal electronic devices. As a proximate result of Defendant J. Manley's and W. Garfield's breaches of contract, Plaintiff has suffered damages.

**Count 10:      Breach of Fiduciary Duty against J. Manley**

84.      PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

85.      Defendant J. Manley owed fiduciary duties to PPC by virtue of, among other things, their status as PPC employees, agents, and confidants who were provided access to PPC's trade secret, confidential, and proprietary information.

86.      Defendant J. Manley breached their fiduciary duties to PPC by, among other things, using their access to PPC's trade secrets, confidential, and proprietary information for their own personal gain and for the gain of Sigma; failing to act primarily for the benefit of PPC in matters connected with their agency and employment by taking and misappropriating PPC's trade secrets, confidential, and proprietary information; and failing to deal openly and to fully disclose to PPC information about matters affecting PPC, including, for example, their plan—and ultimate execution of their plan—to secretly take PPC's trade secrets, confidential, and proprietary information to use in competition with PPC, despite J. Manley's obligations and duties owed to PPC as its Director of Sales and Marketing and as a participant in its Product Development Team,

87.      Defendant J. Manley's breaches of their fiduciary duties have caused damage to PPC and generated significant unjust enrichment for J. Manley, and Sigma, entitling Plaintiff to the additional remedy of disgorgement.

**Count 11:      Alter Ego against J. Manley, Sigma, and Intrepid**

88.      PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

89.      Upon information and belief, Sigma's indirect owner, Justin Manley, is Sigma's alter-ego. Specifically, J. Manley is using the corporate form of Sigma to insulate himself from liability for his improper and unlawful conduct. Accordingly, J. Manley is personally liable for any liabilities incurred by Sigma.

90.      In addition, upon information and belief, Intrepid's indirect owner, Justin Manley, is Intrepid's alter-ego. Specifically, J. Manley is using the corporate form of Intrepid to insulate himself from liability for his improper and unlawful conduct. Accordingly, J. Manley is personally liable for any liabilities incurred by Intrepid.

**Count 12:      Preliminary and Permanent Injunction**

91.      PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

92.      Pursuant to Texas Civil Practice & Remedies Code section 65.011 *et. seq*., PPC requests that this Court grant a preliminary injunction after notice and hearing and a permanent injunction after trial to prevent immediate, severe, and irreparable injury to PPC for which PPC has no equitable remedy at law.

93.      Absent injunctive relief, Defendants will continue to misuse, disclose, convert, and misappropriate PPC's Confidential Information. As described above, Defendants have violated the Copyright Act's work made for hire and derivative works doctrines; misappropriated PPC's trade secrets; stolen and converted PPC's confidential and proprietary information, and trade secrets; engaged and continue to engage in unfair competition with PPC; and have breached their contracts

with and fiduciary duties owed to PPC. The harm that will result to PPC if an injunction is not

issued is irreparable. PPC has no adequate remedy at law to cease the continued conversion,

misuse, disclosure, or misappropriation of PPC's Confidential Information. PPC cannot be

adequately compensated in damages based on the continued misuse of its Confidential Information

and those damages cannot be measured by any certain pecuniary standard.

94.     Therefore, PPC requests that Defendants, directly or indirectly, whether alone or in

conjunction with others, be preliminarily enjoined from:

> a.      Using, copying, purchasing, selling, manufacturing, marketing or advertising the sale of the CFC Kits, the Acoustic Assassin, and any such other products derived from these products;
>
> b.      Using, copying, purchasing, selling, manufacturing, marketing, or advertising any tooling, forms, designs, drawings, or other personal and/or intangible property to create the CFC Kits, the Acoustic Assassin, and any such other products derived from these products.
>
> c.      Using, copying, purchasing, selling, manufacturing, marketing, or advertising any technology and intellectual property associated with the CFC Kits, the Acoustic Assassin, and any such other products derived from these products; and
>
> d.      Possessing, using, and/or disclosing PPC's Confidential Information in any manner.

95.     PPC further requests that the Court set its request for a permanent injunction for

trial on the merits, and, after the trial results in a finding consistent with PPC's position that the

CFC Kits, Acoustic Assassin, and any such other products derived from these products are the

result of Defendants' misuse of PPC's Confidential Information and resources obtained during the

scope of Defendants' employment with PPC, issue a permanent injunction against Defendants.

Therefore, PPC requests that Defendants, directly or indirectly, whether alone or in conjunction

with others, be permanently enjoined from:

> e.      Using, copying, purchasing, selling, manufacturing, marketing or

advertising the sale of the CFC Kits, the Acoustic Assassin, and any such other products derived from these products;

f.   Using, copying, purchasing, selling, manufacturing, marketing, or advertising any tooling, forms, designs, drawings, or other personal and/or intangible property to create the CFC Kits, the Acoustic Assassin, and any such other products derived from these products.

g.   Using, copying, purchasing, selling, manufacturing, marketing, or advertising any technology and intellectual property associated with the CFC Kits, the Acoustic Assassin, and any such other products derived from these products; and

h.   Possessing, using, and/or disclosing PPC's Confidential Information in any manner.

## VI.   CONDITIONS PRECEDENT

96.   PPC re-alleges and incorporates by reference the foregoing factual allegations as if fully set forth herein.

97.   All conditions precedent have been performed or occurred.

## VII.   ATTORNEYS' FEES

98.   PPC has been required to retain the firm of Palter Stokley Sims PLLC to prosecute their claims in this action and has agreed to pay the firm a reasonable fee for the reasonable and necessary services rendered. Thus, pursuant to Sections 38.001 and 37.009, *et. seq.*, of the Texas Civil Practices and Remedies Code, The Texas Uniform Trade Secrets Act, and the Texas Theft Liability Act, PPC is entitled to recover its attorneys' fees from Defendants in connection with the claims advanced herein through trial and including any appeal.

## VIII.   JURY DEMAND

99.   PPC respectfully requests a jury trial on all issues in this case.

## IX.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff Performance Pulsation Control, Inc. ("Plaintiff" or "PPC")
requests that Defendants Sigma Drilling Technologies, LLC ("Sigma"), Intrepid Consulting, LLC
("Intrepid"), Justin Manley ("J. Manley"), Allison Manley ("A. Manley"), William Garfield ("W.
Garfield"), and Pamela Goehring-Garfield ("P. Garfield") (collectively, "Defendants") be cited to
appear and answer, and that, after trial, PPC have judgment against Defendants for:

1.    Declaration that the CFC Kits, the Acoustic Assassin, any such other products
derived from these products, and other intellectual property at issue herein are
trade secrets that are solely owned by Plaintiff;

2.    Declaration that the Patent Applications and any patents issue related thereto, are
solely owned by Plaintiff;

3.    Actual damages;

4.    Consequential damages;

5.    Exemplary damages;

6.    Reasonable Royalty Damages pursuant to the Texas Uniform Trade Secrets Act;

7.    Equitable Forfeiture (*i.e.*, disgorgement of J. Manley's and W. Garfield's
compensation received from PPC);

8.    Attorneys' fees;

9.    Pre-judgment interest as provided by law,

10.   Post-judgment interest as provided by law from the date of judgment until paid;

11.   Costs of court;

12.   Preliminary and permanent injunction; and

13.   Such further relief, at law or in equity, which this Court may deem just and proper
and to which Plaintiff may be entitled.

Respectfully submitted,

*/s/ John T. Palter*

_____

**JOHN T. PALTER**
State Bar No. 15441500
jpalter@palterlaw.com
**KIMBERLY M. J. SIMS**
State Bar No. 24046167
ksims@palterlaw.com
**NATHANIAL L. MARTINEZ**
State Bar No. 24074661
nmartinez@palterlaw.com

**PALTER STOKLEY SIMS PLLC**
Preston Commons – East
8115 Preston Road, Suite 600
Dallas, TX 75225
Tel.: (214) 888-3111
Fax: (214) 888-3109

**ATTORNEYS FOR PLAINTIFF
PERFORMANCE PULSATION CONTROL,
INC.**