# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| PERFORMANCE PULSATION CONTROL, INC., | § § § § | |
| v. | § § | Civil Action No. 4:17-CV-00450 |
| SIGMA DRILLING TECHNOLOGIES, LLC, INTREPID CONSULTING, LLC, JUSTIN MANLEY, ALLISON MANLEY, WILLIAM GARFIELD, ADVANCE RUPTURE DISK TECHNOLOGY, INC., | § § § § § § | Judge Mazzant |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Advanced Rupture Disk Technology, Inc.'s Motion for Summary Judgment (Dkt. #226) and Plaintiff's Motion to Seal Certain Exhibits to Defendant Advanced Rupture Disk Technology, Inc.'s Motion for Summary Judgment (Dkt. #303). After reviewing the motions and the relevant pleadings, the Court finds the motions should be granted.

## BACKGROUND

In May 2013, while employed with Plaintiff Performance Pulsation Control, Inc. ("PPC"), Defendant Justin Manley ("J. Manley") entered negotiations, on behalf of PPC, with Defendant Advanced Rupture Disk Technology ("Advanced") for Advanced to serve as the manufacturer sales representative of PPC. In July 2013, during the course of these negotiations, PPC, through J. Manley, sent Advanced a nondisclosure agreement ("the NDA"). Dave Denning, president of Advanced, signed the NDA and sent it back to PPC on July 22, 2013. PPC did not sign the NDA. In relevant part, the NDA states:

> In consideration for [PPC's] contracting with [Advanced] to perform the Work (defined below) for [PPC] and agreeing to provide [Advanced] with Confidential

Information (defined below) to the extent necessary to perform the Work, [Advanced] agrees as follows:

1. *Definitions.* As used in this Agreement:

 a. **"Work"** means the products and/or services that [Advanced] has agreed to provide to [PPC] pursuant to an agreement entered into between [PPC] and [Advanced] contemporaneously with this Agreement ("Underlying Agreement").

(Dkt. #226, Exhibit 1 at p. 9). After Advanced signed the NDA, J. Manley, on behalf of PPC, sent emails to Advanced containing certain attachments with alleged confidential information, and the parties began negotiating the terms of a "Manufacturer's Sales Representation Agreement" ("MSRA"). Negotiations eventually broke down and the parties never entered the MSRA. Advanced now contracts with J. Manley's new company, Defendant Sigma Drilling Technologies, allegedly formed during J. Manley's employment with PPC, to provide similar services as were the subject of negotiations with PPC. PPC asserts that, in doing so, Advanced is using information sent to Advanced by J. Manley, on behalf of PPC.

Based on this set of facts, PPC filed its Second Amended Complaint alleging—among other causes of action against other defendants in this case—a breach of contract claim against Advanced (Dkt. #73). On November 12, 2018, Advanced filed a motion for summary judgment against this claim (Dkt. #226). PPC filed its response the motion on December 3, 2018 (Dkt. #256). Advanced filed its reply on December 10, 2018 (Dkt. #271). On December 17, 2018, PPC filed its sur-reply (Dkt. #287).

Additionally, PPC filed a motion to seal Exhibits 5, 6, and 15[1] to Advanced's motion for summary judgment (Dkt. #303).[2] Advanced did not file a response to the motion. Accordingly, based on the lack of response, the Court finds the argument well taken and determines the motion should be granted. LOCAL RULE CV-7(d) ("A party's failure to oppose a motion in the manner prescribed herein creates a presumption that the party does not controvert the facts set out by the movant and has no evidence to offer in opposition to the motion.").

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or

---

[1] PPC first references Exhibit 15 and then references Exhibit 16; however, upon the Court's review of the description of the Exhibit, the Court assumes PPC is actually referring to Exhibit 15. Exhibit 15 appears to be a PowerPoint labeled "ARDT Training" created by J. Manley on behalf of PPC, as opposed to Exhibit 16, which appears to be a product catalog. (Dkt. #226, Exhibit 1 at pp. 115–165). In its motion, PPC describes the exhibit it is seeking to seal as "a training presentation prepared by PPC for ARDT . . . ." (Dkt. #303 at p. 1). Accordingly, the Court uses Exhibit 15 instead of Exhibit 16.

[2] The Court notes that this is not Exhibit 5, 6, and 15 listed on the docket. Based on the description presented in the motion, the Court determined PPC is referring to (1) Dkt. #226, Exhibit 1 at pp. 85–95, which is marked as Exhibit 5 to Exhibit A (filed as Exhibit 1); (2) Dkt. #226, Exhibit 1 at pp. 96–97, which is marked as Exhibit 6 to Exhibit A (filed as Exhibit 1); and (3) Dkt. #226, Exhibit 1 at pp. 115–164, which is marked as Exhibit 15 to Exhibit A (filed as Exhibit 1).

declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

# ANALYSIS

Advanced argues that the Court should grant summary judgment as to PPC's claim for breach of contract against Advanced. PPC maintains that it has sufficiently established its breach of contract claim against Advanced.

Under Texas law, "[t]he elements of a breach of contract claim are: (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach." *In re Staley,* 320 S.W.3d 490, 499 (Tex. App.—Dallas 2010, no pet.). The primary dispute in this case is whether a contract was actually formed. "In Texas, a valid contract requires an 'offer, acceptance, mutual assent, execution and delivery of the contract with the intent that it be mutual and binding, and consideration.'" *Frozard v. C.R. Eng., Inc.*, 243 F. Supp. 3d 789, 794 (N.D. Tex. 2017) (citations omitted). "[T]he question of whether an offer was accepted and a contract was formed is primarily a question of law for the [C]ourt to decide." *Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 410 (5th Cir. 1996).

Advanced's main argument is that the contract was not formed because the parties did not agree on all essential terms of the contract. According to Advanced, "Work" is a material and essential term and that term was not reasonably defined. PPC counters that the all material and essential terms of the NDA are reasonably defined. "Mutual assent, concerning material, essential terms, is a prerequisite to formation of a binding, enforceable contract." *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 530 (Tex. App.—Houston [1st Dist.] 2007) (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)). "To be enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'" *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Pace Corp. v.*

*Jackson*, 284 S.W.2d 340, 345 (1955)). Accordingly, to determine whether mutual assent existed in this case, the Court must first determine whether "Work" is a material and essential term and, if so, if it is defined with the required level of specificity.

In so doing, the Court is required to engage in contract interpretation. Thus, the Court looks to these guiding principles described by the Fifth Circuit in interpreting contracts under Texas law.

> "In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." Under Texas law,[3] the interpretation of an unambiguous contract is a question of law for the court to decide by "looking at the contract as a whole in light of the circumstances present when the contract was entered." "If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." If, however, the language of the contract is subject to two or more reasonable interpretations or meanings, it is ambiguous. "A contract is not ambiguous merely because the parties to an agreement proffer conflicting interpretations of a term." Under Texas law, "[t]he primary concern of a court construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." "In construing a contract under Texas law, courts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless." "The terms used in the [contract] are given their plain, ordinary meaning unless the [contract] itself shows that the parties intended the terms to have a different, technical meaning."

*Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (quotations and citations omitted).

---

[3] The Fifth Circuit in this case applied Texas contract law because it was a case sitting in diversity jurisdiction. *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004). Here, the Court has federal question jurisdiction with supplemental jurisdiction over state law claims; however, no party disputes that Texas contract law applies to this state law cause of action against Advanced.

## I. Material and Essential

Advanced asserts that "Work" is a material and essential term of the NDA because it defines the parties' roles and obligations. PPC counters that the only material and essential terms to the NDA are that PPC will provide confidential information to Advanced and Advanced will keep that information confidential.[4]

> [A] contract need only be definite and certain as to those terms that are "material and essential" to the parties' agreement. Other courts have held that, under Texas law, material and essential terms are those that parties would reasonably regard as "virtually important ingredient[s]" of their bargain . . . . "[T]he material terms of a contract are determined on a case-by-case basis," and "[e]ach contract should be considered separately to determine its material terms."

*Fischer*, 479 S.W.3d at 237 (first and third alteration in original) (citations omitted).

The NDA, in relevant part, states: "In consideration for [PPC's] contracting with [Advanced] to perform the Work (defined below) for [PPC] and agreeing to provide [Advanced] with Confidential Information (defined below) to the extent necessary to perform the Work, [Advanced] agrees as follows . . . ." (Dkt. #226, Exhibit 1 at p. 9). The only reasonable interpretation of this clause indicates that "Work" defines part of the consideration for which the parties bargained. As identified by Advanced, the consideration based on the plain and unambiguous words of the NDA is a contract to perform "Work" *and* provide confidential information.[5] Moreover, the definition of "Work" provides the extent to which PPC was required to provide confidential information to Advanced, further giving clarity to the consideration for which the parties in this case bargained and also providing clarity to its roles and obligations under

---

[4] As will be further discussed, the definition of "Work" is tied to the parties entering the Underlying Agreement. PPC also argues that because entering the Underlying Agreement is not a condition precedent to the NDA, "Work" is immaterial. However, determining a material term differs from determining whether a requirement in the contract is a condition precedent or a covenant.

[5] The Court also finds intriguing the argument that there is not full consideration in this case because a contract for "Work" was supposed to be consideration along with the delivery of confidential information and the parties never entered into the MSRA. However, the Court need not explore this argument because the Court finds the contract was not properly formed without turning to consideration.

the NDA.  As such, based on this alone, the Court finds "Work" to be material and essential.  *See, e.g.*, *Allamon Tool Co. v. Derryberry*, No. 09-06-200 CV, 2007 WL 3306671, at *2–*3 (Tex. App.—Beaumont, Nov. 8, 2007, no pet.); *John Wood Grp. USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 20 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (considering one of the essential elements for a contract for sale to be "the consideration . . . for the thing sold").

However, the Court finds further support for this determination looking to the remainder of the NDA. The "**End Date**" is defined as "[i]f the Underlying Agreement is terminated before the Work is completed, 'End Date' means the date the Underlying Agreement is terminated. Otherwise, 'End Date' means the date the Work is completed."  (Dkt. #226, Exhibit 1 at p. 9).  The "End Date", as defined by "Work" and the Underlying Agreement, further details the parties' roles and obligations in relation to the NDA.    (Dkt. #226, Exhibit 1 at p. 12) (examples including "[d]uring the period from the date of this Agreement to a date five years after the End Date, Advanced will not . . . directly or indirectly use any Trade Secret . . . and will not directly or indirectly disclose Confidential Information . . . " and "[a]ll physical and electronic media incorporating Confidential Information that are in the possession or control of [Advanced] . . . shall be returned to [PPC] . . . within fourteen (14) days of the End Date").  *See Allamon Tool Co.*, 2007 WL 3306671, at *2–*3.  Therefore, "Work" is a material and essential term.

## II.    Reasonable Degree of Certainty

Because the Court finds that "Work" is a material and essential term, the Court turns to the parties' arguments concerning the specificity with which it is defined.  In relevant part, the NDA states: "**'Work'** means the products and/or services that [Advanced] has agreed to provide to [PPC] pursuant to an agreement entered into between [PPC] and [Advanced] contemporaneously with this Agreement ("Underlying Agreement")."  (Dkt. #226, Exhibit 1 at p. 9).  Based on the

plain language of the NDA, the Underlying Agreement is placed at issue when determining the certainty of the term "Work". The parties disagree as to which agreement is intended to be the Underlying Agreement. Accordingly, the Court first discusses the different possibilities for what serves as the Underlying Agreement and then discusses the certainty with which the term is defined.

### A. The Underlying Agreement

Advanced contends that the attempted MSRA was intended to be the Underlying Agreement. PPC argues that the parties entered a verbal agreement[6] after Advanced signed the NDA. According to PPC not only was the verbal agreement permitted to be the Underlying Agreement but was in fact required to be the Underlying Agreement. Thus, the Court analyzes whether the verbal agreement was required, whether the verbal agreement is permitted to be and is in fact the Underlying Agreement, and whether the parties intended the verbal agreement to be the Underlying Agreement.

### 1. Is the Verbal Agreement Required to be the Underlying Agreement?

PPC first argues that the language of the NDA requires the verbal agreement to be the Underlying Agreement. The NDA states that the Underlying Agreement would be entered into "contemporaneously with" the NDA. PPC avers that the verbal agreement is the only agreement that was entered into contemporaneously with the NDA when it was executed. Although not in direct response to this argument, which was raised in PPC's sur-reply, Advanced argues that the NDA was never properly executed due to the fact that only Advanced signed the NDA. Therefore, if the NDA was not properly executed,[7] the alleged verbal agreement would not have been entered

---

[6] Because there is an alleged verbal agreement in this case, the Court must look outside the four corners of the NDA to determine the validity of the verbal agreement.

[7] The Court clarifies that whether there was "proper execution" or what the effective date of the NDA was does not implicate whether all the material terms were in fact defined with a reasonable degree of certainty. This discussion is

into contemporaneously with the NDA and the language of the NDA would not require the verbal agreement to be the Underlying Agreement.

Although it is not necessary for a contract to be signed by both parties to be valid, *Traders Int'l, Ltd. v. Scheuermann*, Civil Action No. H-06-16322006, 2006 WL 2521336, at *6 (S.D. Tex. Aug. 30, 2006) (citations omitted), "execution and delivery of the contract with the intent that it be mutual and binding," *Frozard*, 243 F. Supp. 3d at 794 (citations omitted), does "'commonly consist of signing and delivery'" if that was the intent of the parties. *Scaife*, 100 F.3d at 411 (quoting *Simmons & Simmons Constr. Co. v. Rea*, 286 S.W.2d 415, 418 (Tex. 1955)). The presence of a signature block alone is not sufficient to suggest it was the intent of the parties to have an agreement go into effect after both signatures. *Tricon Energy Ltd. v. Vinmar, Int'l, Ltd.*, 718 F.3d 448, 454–55 (5th Cir. 2013); *Wright v. Hernandez*, 469 S.W.3d 744, 760 (Tex. App.— El Paso 2015, no pet.).

It is arguable that in this case, the parties in fact intended for both Advanced and PPC to sign the NDA for a proper execution demonstrating the parties agreed to all the terms. Here, the NDA did contain a signature block for both parties. (Dkt. #226, Exhibit 1 at p. 16). But more than that, PPC specifically required Advanced to sign the NDA, indicating the intent that the NDA be signed. Even further, directly above the signature blocks, the NDA states: "[d]ated as of the latest date set forth below," suggesting that the NDA would not go into effect until both parties signed the NDA (Dkt. #226, Exhibit 1 at p. 16).[8] The Court finds these facts surpass having merely

---

simply to analyze the contemporaneous language contained in the NDA to properly determine what alleged agreement the Court is to look to when determining whether there is mutual assent based on all the material and essential terms being properly defined.

[8] Although this reasoning may appear circular, it is also convincing that the parties were not intending for the signature of only Advanced because of the contemporaneous language in the NDA. Looking to the plain terms of the NDA, the Underlying Agreement is supposed to be entered into contemporaneously with the NDA going into effect. As the Court further explains, the Court is not convinced that the parties ever intended for the alleged verbal agreement to constitute the Underlying Agreement. Thus, the fact that the parties did not also enter the Underlying Agreement at the moment Advanced signed the NDA, and continued to negotiate the MSRA, indicates to the Court that the intent

having signature blocks. *Compare Scaife*, 100 F.3d at 411 *with Tricon Energy Ltd.*, 718 F.3d at 454–55. These facts suggest that the parties intended for the NDA to be executed by Advanced *and PPC* signing the NDA. Because the Court is not convinced that the NDA was fully executed after only Advanced's signature, the Court is equally not convinced that the alleged verbal agreement was entered into contemporaneously with the NDA. Therefore, the Court remains unpersuaded that the verbal agreement is required to be the Underlying Agreement.[9]

### 2. Did the Parties Enter the Verbal Agreement?

Even though the Court finds that it is likely the verbal agreement is not required to be the Underlying Agreement, the Court determines if the verbal agreement can be the Underlying Agreement. PPC asserts that the parties entered into a verbal agreement when Advanced signed the NDA. According to PPC, the NDA does not require the Underlying Agreement to be a written agreement; accordingly, PPC argues that the verbal agreement is the Underlying Agreement. Advanced does not contest that there is a requirement the Underlying Agreement be written, but identifies the late nature with which this verbal agreement is alleged. Additionally, Advanced maintains that there is a lack of evidence surrounding this newly alleged verbal agreement.

The Court agrees with Advanced. It is likely that PPC did not meet its summary judgment burden[10] to show the existence of the verbal agreement. The alleged oral agreement was raised, for the first time, in John Rogers's, the sole member and owner of PPC, First Supplemental

_____

of the parties was to have both Advanced and PPC sign the NDA before it was considered properly executed and effective.

[9] For the remainder of the analysis, the Court will operate under the assumption that, by Advanced signing the NDA and by PPC sending alleged confidential information to PPC, the NDA was properly executed. *Traders Int'l, Ltd. v. Scheuermann*, Civil Action No. H-06-16322006, 2006 WL 2521336, at *6 (S.D. Tex. Aug. 30, 2006) (citing *Lee & Lee Int'l, Inc. v. Lee*, 261 F. Supp. 2d 665, 672 (N.D. Tex. 2003)) (holding "for a contract to be valid, it is not necessary that the agreement be signed by both parties; if one party signs, the other may accept the agreement by his acts, conduct, or acquiescence in the terms of the contract.").

[10] The Court is aware that this is Advanced's motion for summary judgment. However, once Advanced met its initial burden, the burden shifts to PPC as indicated in the Court's legal standard.

Declaration.[11]  (Dkt. #256, Exhibit 1 at pp. 20–22).  It was signed on December 3, 2018, after Advanced filed the present Motion for Summary Judgment (Dkt. #256, Exhibit 1 at p. 22).  As identified by Advanced, this allegation of a verbal agreement arises late in the litigation process.  However, even looking to the new allegation made by Rogers in his declaration, Rogers does not definitively claim there was a verbal agreement but merely claims that "*it appears* there was a verbal agreement." (Dkt. #256, Exhibit 1 at p. 20) (emphasis added).  Not only, did Rogers simply suggest that it appeared there was an agreement, Rogers also was not sure who made the agreement, stating the oral agreement was "between Justin Manley on behalf of PPC and Michael Kelly *and/or* Dave Denning on behalf of [Advanced]."  (Dkt. #256, Exhibit 1 at pp. 20–21) (emphasis added).

Moreover, the new allegation made by Rogers differs from previous testimony provided by Rogers.  In his declaration, Rogers claims that there was a verbal agreement "to begin the early work of providing services." (Dkt. #256, Exhibit 1 at p. 20).  Rogers previously testified in his deposition, taken on September 12, 2018, prior to Advanced filing the present motion, that, although PPC attempted to form a business relationship with Advanced, such conversations broke down and Advanced was never a PPC sales representative (Dkt. #226, Exhibit 3 at pp. 4–6).  At that time, Rogers did not mention that PPC and Advanced entered any oral or verbal agreement or even that Advanced started to work for PPC while attempting to work out a formal written agreement (Dkt. #226, Exhibit 3 at pp. 4–6).

The Court finds that the new verbal agreement is alleged late in the litigation process, at the convenient time when PPC realized it would be beneficial to have entered into a verbal agreement, and after PPC's sole member and owner already testified that PPC and Advanced did

[11] In its reply, Advanced objects to John Rogers's Declarations (Dkt. #271 at pp. 3–4).  However, because the Court finds in Advanced's favor looking to the declarations, the Court overrules the objections.

not work together.  To the Court, this set of circumstances, at the very least, calls into question the existence of the verbal agreement.

### 3. Did the Parties Intend for the Verbal Agreement to be the Underlying Agreement?

Even if the verbal agreement between the parties existed, the Court is not persuaded that the parties intended for the alleged verbal agreement to be the Underlying Agreement.  Here, all the parties directly involved in the negotiations, including the PPC employee actually engaged in conversations with Advanced, claim that the MSRA was intended to be the Underlying Agreement.[12]  *See, e.g.*, (Dkt. #226, Exhibit 2, at pp. 3–4) (stating "On August 5, 2013, I [,J. Manley, on behalf of PPC,] received an email from Denning with a proposed Manufacturer's Sales Representation Agreement ('MSRA'), the 'Underlying Agreement' referenced in the proposed NDA.").

Moreover, turning back to Rogers's declaration it states that the parties entered this alleged verbal agreement "before a formal written agreement could be reached . . . ."  (Dkt. #256, Exhibit 1 at pp. 20–21.  Aside from the lack of certainty around whether there in fact was a verbal agreement at all, and if there was, who in fact made that agreement, Rogers's statement also demonstrates an intent to have a formal written agreement with Advanced (Dkt. #256, Exhibit 1 at pp. 20–21).  The plain and unambiguous reading of the NDA indicates that there would only be one Underlying Agreement.  (Dkt. #226, Exhibit 1 at p. 9) ("pursuant to *an* agreement").  The Court finds it unreasonable to interpret the NDA to suggest that there would first be a verbal agreement that would constitute the Underlying Agreement and then there would be a written

---

[12] The Court acknowledges the employee for PPC at this time was J. Manley, a defendant in this case.  The Court would not find that J. Manley's statement alone resulted in no genuine issues of material fact, but does find it supports the other evidence in this case to result in no genuine issues of material fact.

agreement that, at that point, would constitute the Underlying Agreement. As such, the Court finds that the parties demonstrated an intent to have the MSRA serve as the Underlying Agreement.

### B. Definiteness of "Work"

Advanced maintains that "Work" remains undefined and, therefore, the NDA is not a valid enforceable contract. PPC asserts that "Work" is properly defined. The level of specificity with which the material and essential terms need to be defined is not clearly identified but the "contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound and also be sufficiently definite to 'enable a court to understand the parties' obligations and to give an appropriate remedy if they are breached." *Fischer*, 479 S.W.3d at 237 (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (1981)).

#### 1. MSRA

The Court previously determined that the verbal agreement was not necessarily required to be the Underlying Agreement, that its existence, at this stage, is questionable, and, at the very least, it was not the intention of the parties for the verbal agreement to serve as the Underlying Agreement. As such, the intended Underlying Agreement was most likely the MSRA. "'It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree.'" *Fischer*, 479 S.W.3d at 237 (quoting *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846); *accord T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) (citations omitted) (holding "[w]here an essential term is open for future negotiation, there is no binding contract"). Because "Work" was left open to be determined by the Underlying Agreement, the

MSRA, and the parties never entered into the MSRA, the NDA is not binding on the parties and is just an agreement to agree. *See id.*

## 2. Verbal Agreement

However, even accepting the alleged oral agreement and assuming it was intended to provide the definition of "Work", the Court finds "Work" is not defined to a reasonable degree of certainty. In his declaration, Rogers states that "it appears there was a verbal agreement between Justin Manley on behalf of PPC and Michael Kelly and/or Dave Denning on behalf of [Advanced] to begin the early work of providing services to PPC *before a formal written agreement could be reached . . .*" (Dkt. #256, Exhibit 1 at pp. 20–21) (emphasis added). As previously identified, this language demonstrates an intent to have a formal written agreement with Advanced (Dkt. #256, Exhibit 1 at pp. 20–21).

This creates a problem for PPC on the issue at hand, the certainty with which "Work" is defined. Under PPC's theory, "Work" would first be defined by the alleged verbal agreement and then redefined later by the formal written agreement.[13] This results in a floating definition of the term "Work", which the Court finds is not definite or reasonably certain. As such, even assuming the NDA was properly executed and the parties entered into a verbal agreement that constituted the Underlying Agreement until a formal written agreement could be reached, "Work" is not defined to a reasonable degree of certainty and is therefore not an enforceable contract.

---

[13] The Court reaches this conclusion based on the plain and unambiguous reading of the NDA. If, under PPC's theory, "Work" was not redefined by the MSRA, then the end date would essentially be the end of the oral agreement, and would not apply during the formal written relationship between the parties. (Dkt. #226, Exhibit 1 at p. 9) ("**'End Date'**: If the Underlying Agreement is terminated before the Work is completed, 'End Date' means the date the Underlying Agreement is terminated. Otherwise, 'End Date' means the date the Work is completed."). Moreover, it would not be reasonable to provide confidential information to the extent necessary to perform work under a prior agreement of the definition of work. (Dkt. #226, Exhibit 1 at p. 9) ("agreeing to provide [Advanced] with Confidential Information to the extent necessary to perform the Work."). Thus, the Court concludes the only reasonable interpretation would be for the term "Work" to be redefined upon the entering of the MSRA.

Accordingly, the Court finds PPC cannot assert a claim for breach of contract and the motion should be granted.[14]

The Court made such determination without using any of the evidence PPC objected to in its response to the motion and thus does not address the objections contained in the response. (Dkt. #256 at p. 4).[15]

## CONCLUSION

It is therefore **ORDERED** that Advanced Rupture Disk Technology, Inc.'s Motion for Summary Judgment (Dkt. #226) is hereby **GRANTED** and Plaintiff's Motion to Seal Certain Exhibits to Defendant Advanced Rupture Disk Technology, Inc.'s Motion for Summary Judgment (Dkt #303) is hereby **GRANTED**. As such, Advanced Rupture Disk Technology, Inc. is hereby **DISMISSED WITH PREJUDICE**.

It is therefore **ORDERED** that "Exhibit 5", found at Dkt. #226, Exhibit 1 at pp. 85–95, which is marked as Exhibit 5 to Exhibit A; "Exhibit 6", found at Dkt. #226, Exhibit 1 at pp. 96–97, which is marked as Exhibit 6 to Exhibit A; and "Exhibit 15", found at Dkt. #226, Exhibit 1 at pp. 115–164, which is marked as Exhibit 15 to Exhibit A, be sealed by the Clerk of the Court.

**SIGNED this 11th day of March, 2019.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

---

[14] The Court notes as a practical matter, that Defendant J. Manley, was the PPC employee who sent information to Advanced. Any information Advanced ever received, J. Manley already had access to. Claims are still pending in this suit against J. Manley.

[15] PPC also objects to "any testimony in which [J. Manley] attempts to certify any of the record produced by PPC." (Dkt. #256 at p. 4). The Court does not consider broad objections, such as this one. Instead, the Court only considers objections to specific exhibits or paragraphs to exhibits.